**LAW OFFICES**
**SHERMAN & HOWARD L.L.C.**
2800 NORTH CENTRAL AVENUE, SUITE 1100
PHOENIX, ARIZONA 85004-1043
TELEPHONE: (602) 240-3000
FAX: (602) 240-6600
(AZ BAR FIRM NO. 00441000)
Bryan A. Albue (AZ Bar No. 009594)
balbue@shermanhoward.com
Attorneys for PMC Commercial Trust

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>ARIZONA LIZANATAY, LLC, et al.,<br><br>Debtor.<br><br>THIS FILING APPLIES TO:<br><br>■ ALL DEBTORS<br>□ SPECIFIED DEBTORS<br><br>LIZANATAY MANAGEMENT SERVICES, L.L.C.;<br>LIZANATAY HOLDINGS, L.L.C.;<br>BUFFALO PROPERTIES, L.L.C.;<br>GRAND VALLEY LIZANATAY, L.L.C.;<br>RAWLINS LIZANATAY, L.L.C.; and<br>HART STREET LIZANATAY, L.L.C.<br><br>Debtors. | Chapter 11 Proceedings<br><br>Case No. 2:10-bk-33205-RJH<br><br>Jointly Administered With:<br><br>2:10-bk-33209-RJH<br>2:10-bk-33218-RJH<br>2:10-bk-33222-RJH<br>2:10-bk-33225-RJH<br>2:10-bk-33228-RJH<br>2:10-bk-33234-RJH<br><br>**PMC COMMERCIAL TRUST'S OBJECTION TO DEBTORS' AMENDED CHAPTER 11 PLAN OF REORGANIZATION DATED NOVEMBER 29, 2010**<br><br>Date: January 11, 2011<br>Time: 10:00 a.m.<br>Place: Courtroom 603, 6th Floor<br>Phoenix, Arizona |

PMC Commercial Trust ("PMC Trust"), the holder of claims against Buffalo Properties, L.L.C. ("Buffalo Properties") and Hart Street Lizanatay, LLC ("Hart Street"), two of the debtors in these jointly administered cases, which are secured by an interest in certain real and other property, including the rents and proceeds therefrom, files its Objection to Debtors' Amended Chapter 11 Plan of Reorganization Dated November 29, 2010 (the "Plan"). This Objection is supported by the following Memorandum of Points and Authorities.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. STATEMENT OF FACTS AND ALLEGATIONS

### A. The Debtors and Their Business Operations.

1. Lizanatay Holdings, L.L.C. ("Holdings") is the sole or substantial owner of the certain entities, each of which operates a hotel (collectively, the "Hotels"), including: (i) Best Western Cross Roads Inn located at 75 N. Bypass Road, Buffalo, Wyoming 82834; (ii) Best Western Phoenix Goodyear Inn located at 55 North Litchfield Road, Goodyear, Arizona 85338; (iii) La Quinta Inn and Suites located at 570 Raptor Court, Fruita, Colorado, 81521; (iv) Super 8 Motel located at 655 Hart Street, Buffalo, Wyoming 82834; and (v) Quality Inn located at 1801 E. Cedar Rd., Rawlins, Wyoming 82301. Holdings is owned in equal portions by Dallas Bligh and Christina Bligh (collectively, the "Blighs").

2. In the summer of 2010, Lizanatay Management Services, L.L.C. ("Management") was formed which contracted with the Hotels to provide certain management services, which are paid for by the various Hotels. Management is wholly owned by Holdings and its principal place of business is in Goodyear, Arizona.

3. The Hotels are allegedly operated as "one enterprise" and that, through an entity known as Lizanatay, Inc., operating proceeds from certain Hotels are transferred to others to make up operating losses during a particular Hotel's slow season.

4. The entities owning the Hotels, Holdings, Management and Lizanatay, Inc. (collectively, "Debtors") filed for relief under Chapter 11 of the Bankruptcy Code on October 14, 2010 (the "Petition Date").

5. Buffalo Properties, L.L.C. ("Buffalo Properties") is the owner of certain real and other property located at 75 N. Bypass Road in Buffalo, Wyoming (the "Buffalo Property"), which it operates as the Best Western Cross Roads Inn.

6. Pursuant to a Promissory Note dated May 16, 2007 (the "Buffalo Note"), PMC Trust loaned $1,850,000.00 to Buffalo Properties on certain terms and conditions (the "Buffalo Loan").

7. The Buffalo Loan is secured by a Mortgage, Assignment of Leases and Rents and Security Agreement dated May 16, 2007 (the, "Buffalo Mortgage"), which grants to PMC Trust an interest in, among other things, the Buffalo Property, which is more particularly described in the Buffalo Mortgage, and all leases for the Buffalo Property and all present and future rents, revenues, income, uses, royalties, profits, and other benefits derived from the Buffalo Property. The Buffalo Mortgage was recorded on May 22, 2007 as Document 066493 in book 88A-175 page 426-476 of the Official Records of Johnson County, State of Wyoming.

8. Perfection of PMC Trust's interest in the property of Buffalo Properties is further evidenced by a UCC Financing Statement recorded on May 22, 2007 as Document 066495 in book 86A-63 page 707-709 of the Official Record of Johnson County, State of Wyoming and filed on May 24, 2007 as Document No. 2007-32941438 with the Secretary of State, State of Wyoming.

9. A Guaranty was executed by the Blighs, pursuant to which they guaranteed full payment, performance and satisfaction of the Buffalo Loan.

10. The applicable interest rate on the principal balance due under the Buffalo Note is the LIBOR Rate (as defined in the Buffalo Note) plus the Add-On Rate of 3.25%. As of the Petition Date, the applicable interest rate under the Buffalo Note was 3.54%. The interest rate on the Buffalo Note is adjusted quarterly. The Maturity Date, as defined in the Buffalo Note is 20 years from the date of the Buffalo Note.

11. Hart Street is the owner of certain real and other property located at 655 E. Hart Street in Buffalo, Wyoming (the "Hart Street Property"), which it operates as a Super 8 Motel.

12. Pursuant to a Promissory Note dated May 16, 2007 (the "Hart Street Note"), PMC Trust loaned $1,555,000.00 to Hart Street on certain terms and conditions (the "Hart Street Loan").

13. The Hart Street Loan is secured by, among other things, a Mortgage, Assignment of Leases and Rents and Security Agreement dated May 16, 2007 (the

"Hart Street Mortgage"), which grants to PMC Trust an interest in, among other things, the Hart Street Property, which is more particularly described in the Hart Street Mortgage, and all leases for the Hart Street Property and all present and future rents, revenues, income, uses, royalties, profits, and other benefits derived from the Hart Street Property. The Hart Street Mortgage was recorded on May 22, 2007 as Document 066499 in book 88A-175 page 521-576 of the Official Records of Johnson County, State of Wyoming.

14. Perfection of PMC Trust's interest in the property of Hart Street is further evidenced by a UCC Financing Statement recorded on May 22, 2007 as Document 066501 in book 86A-63 page 711-713 of the Official Record of Johnson County, State of Wyoming and filed on May 24, 2007 as Document No. 2007-32941640 with the Secretary of State, State of Wyoming.

15. The Hart Street Loan also is secured by a Mortgage, Assignment of Leases and Rents and Security Agreement dated May 16, 2007 (the "Second Hart Street Mortgage") and recorded on May 22, 2007 as Document 066494 in book 88A-175 page 477-520 of the Official Records of Johnson County, State of Wyoming which grants to PMC Trust an interest in, among other things, the Buffalo Property, which is junior to the interest granted to secure the Buffalo Loan.

16. A Guaranty was executed by the Blighs, pursuant to which they guaranteed full payment, performance and satisfaction of the Hart Street Loan.

17. The applicable interest rate on the principal balance due under the Hart Street Note is the LIBOR Rate (as defined in the Hart Street Note) plus the Add-On Rate of 3.25%. As of the Petition Date, the applicable interest rate under the Buffalo Note was 3.54%. The interest rate on the Hart Street Note is adjusted quarterly. The Maturity Date, as defined in the Hart Street Note is 20 years from the date of the Hart Street Note.

18. The Amended Disclosure Statement in Support of Chapter 11 Plan of Reorganization Dated November 29, 2010 (the "Disclosure Statement") states that, prior to the filing of bankruptcy, Debtors undertook steps to substantially reduce expenses.

Efforts to reduce expenses included: (i) elimination of breakfast or lunch service at some locations; (ii) elimination of all newspaper and radio advertising; (iii) early removal or elimination of billboards, including those in Buffalo, Wyoming; (iv) modifications to promotional programs; (v) reduction in repair and maintenance expenses; and (vi) property tax abatements that expired at the end of 2010.

    19.    The Disclosure Statement states on page 12 that:

> Beginning in late 2007, Buffalo recognized a gradual slowdown in business at the Best Western. Since 1997, revenues are down 50% on average. The primary cause of the decline in business is the economic downturn. In addition, the nature of the hotel business is seasonal. The population of Buffalo was growing initially. Presently, it is difficult to find employment within the Buffalo city limits, so residents are relocating out of Buffalo seeking employment in other cities.
>
> In addition Buffalo had a significant oil and gas industry in the 1990s and early 2000s. This industry has slowed down significantly. This slow down is impacting the hotel and restaurant business in Buffalo.
>
> In 2007, this hotel generated approximately $92,000 in room revenue and $54,000.00 on restaurant revenue per month. From mid 2008 to present, room revenues tapered to approximately $54,000.00 per month and revenue from the restaurant was down to about approximately $44,000.00 per month. Generally, the peak business generated emanating from the real estate market boom was an anomaly as reflected by the sales figures for this year being similar to years 2001-2004.
>
> Another reason for the decline was an environmental issue. Buffalo is the habitat for the Sage Grouse which led to new restrictions on the planned construction of wind farms and prevented the growth of revenue from that work in the region.

    20.    Based on information in the Disclosure Statement, total revenues for Buffalo Properties currently are $1,176,000.00 on an annualized basis. Exhibit 2 to the Disclosure Statement projects revenues of $1,277,637.00 in 2011 for Buffalo Properties and $521,000.00 for Hart Street. As listed on Exhibit 2, the projected revenues in 2011 for the other Hotels are: (i) $1,645,217.00 for the Best Western Phoenix Goodyear Inn in Goodyear, Arizona; (ii) $1,178,000.00 for the La Quinta Inn and Suites in Fruita, Colorado, 81521; and (iii) $2,242,000.00 for the Quality Inn located in Rawlins, Wyoming 82301.

## II. LEGAL ARGUMENT

### A. Burden and Standard of Proof.

As the proponent of a plan, the debtor has the burden of proving that each and every element of 11 U.S.C. § 1129(a) has been satisfied. *In re Ambanc La Mesa L. P.*, 115 F.3d 650 (9th Cir. 1997). "The burden of proposing a plan that satisfies the requirements of the Code always falls on the party proposing it, but it falls particularly heavily on the debtor-in-possession or trustee since they stand in a fiduciary relationship to the estate's creditors." *In re Perez*, 30 F.3d 1209, 1214 n.5 (9th Cir. 1994). A bankruptcy court may only confirm a plan if, in addition to other requirements, "the plan complies with the applicable provision[s] of Title 11." *Id.* at 1213 (9th Cir. 1994).

The bankruptcy court has "a mandatory independent duty to determine whether the plan has met all of the requirements necessary for confirmation." *In re Williams*, 850 F.2d 250, 253 (5th Cir. 1988). *See In re Ives*, 289 B.R. 726, 728-729 (Bankr. D. Ariz. 2003) (The bankruptcy court "has a responsibility to ensure plan compliance with the Bankruptcy Code even in the absence of objection."); *see also In re Tucson Properties Corp.*, 193 B.R. 292, 299 (Bankr. D. Ariz. 1995) (dismissing a debtor's bankruptcy petition, in part under Section 1129(a)(1), because of the debtor's failure to propose a confirmable plan).

### B. The Proposed Plan is not Feasible and will not Lead to a Successful Reorganization.

A condition to the confirmation of a plan is the finding that it is feasible under 11 U.S.C. § 1129(a)(11). The purpose of the feasibility test is to protect against visionary or speculative plans. As noted by the Ninth Circuit:

> The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.

*In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985); 7 *Collier on Bankruptcy* ¶ 1129.03[11] (15th Ed., rev. 2009)

Feasibility contemplates "the probability of actual performance of the provisions of the plan." *In re Hoffman*, 52 B.R. 212, 215 (Bankr. D. N.D. 1985). Factors to be considered when judging feasibility of a Chapter 11 plan include the business's earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company. *In re Hoffman*, 52 B.R. at 215; *In re Great Northern Protective Services, Inc.*, 19 B.R. 802, 803 (Bankr. W.D. Wash. 1982).

"Where a debtor proposes to fund a plan out of operating revenue, its financial record during the pendency of Chapter 11 is probative of feasibility (Citations omitted). Income projections indicating financial progress must be based on concrete evidence of financial progress, and must not be speculative, conjectural, or unrealistic predictions. (Citations omitted)." *In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485 (Bankr. D. Mass. 1983). *See In the Matter of Equity Funding Corporation of America*, 416 F. Supp. 132 (C.D. Cal. 1975); *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374 (9th Cir. 1985). Moreover, the longer the plan extends, the stricter the proof required as to feasibility and adequate protection. *In re KRO Assocs.*, 4 B.C.D. 462 (Bankr. S.D. N.Y. 1978).

In this case, Debtors have offered projections that appear to provide substantially more revenue than what the Buffalo Property and Hart Street Property currently are generating. Debtors have offered nothing to support such increases. In fact, the reasons for the decline in revenues over the past several years appear to be largely systemic to the area and may persist for many years to come.

Moreover, Debtors detail a number of steps that have been taken to reduce costs and expenses. Many of the expenses cut relate to advertising, marketing and promotion. Specifically, Debtors have eliminated or reduced the use of billboards in the Buffalo, Wyoming area. Debtors do not suggest that these steps were taken because the efforts were not beneficial or valuable. Rather, the only reason the efforts were discontinued appears to be that Debtors could not afford the costs. Debtors provide no estimate of the possible negative impact that these cuts in advertising, marketing and

promotion will have. Indeed, Debtors concede that "The hotel industry is highly competitive." [Disclosure Statement, page 66, line 4] Further, Debtors indicate that breakfast and lunch service has been reduced or cut in certain locations. To the extent these cuts involve Buffalo Properties, an appropriate reduction in anticipated revenue must be made.

The amount paid for management fees also appears to be excessive, which also impairs the competiveness and economic viability of the Hotels. Moreover, given the cuts in advertising and related management functions, it is unclear why the Hotels need extensive management support. Monthly fees from all the Hotels total $22,140.00 per month plus 10% of "Net Operational Income," a term which is not defined. As a result, it is not possible to determine the full extent of the management charges that may be assessed to the Hotels. Further disclosure regarding the management fees is required and Debtors' request for such fees must be denied absent a showing the services provided are necessary and that the charges are fair and reasonable and in line with what would be charged by an independent third party.

The Plan does not provide for adequate capitalization. The Plan provides that the Blighs will contribute $200,000.00 on the Effective Date. No information is provided as to how these funds will be used or to which Debtors they will be provided. Total annual revenue from the Hotels is projected to be $6,863,854. A contribution of $200,000 is but 2.9% of this amount and is a contribution that is trivial and immaterial.

In conclusion, Debtors cannot satisfy 11 U.S.C. § 1129(a)(11) and establish that the Plan is feasible.

**C. The Plan is Not Fair and Equitable and Unfairly Discriminates Against PMC Trust.**

Section 1129 requires that, to confirm a plan under the cramdown provision, the plan must be "fair and equitable." 11 U.S.C. § 1129(b)(1). With respect to secured claims, a plan is fair and equitable if either: (i) the secured creditor (a) retains its lien in the collateral to the extent of the allowed amount of the secured claim, and (b) receives

deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; or (ii) the secured creditor realizes the "indubitable equivalent" of its secured claim. *See* 11 U.S.C. § 1129(b)(2)(A).

### 1. The Plan Impermissibly Places on PMC Trust the Risks Associated with the Plan and Burdens in the Event of Failure.

The Plan alters PMC Trust's rights in a way that increases PMC Trust's risk exposure. Debtors seek to compel PMC Trust to participate in a speculative venture wherein all the risks of loss are placed on PMC Trust. In *In re Coastal Equities*, the Court delineated the general standard for confirmation in the context of "cram down". The court stated:

> The standards of forced confirmation, commonly referred to as "cram down" are found in Section 1129(b)(2)(A). The standard which is applicable in this instance would require that the holders of the claims must retain their liens on the subject property, and receive at least the value of such holder's interest. 11 U.S.C. § 1129(b)(2)(A)(i). In short, <u>the claimant must get the benefit of its bargain</u>.

*In re Coastal Equities*, 33 B.R. 888, 906, (S.D. Cal. 1983) (emphasis added). No plan can be "fair and equitable" which compromises the rights of senior creditors in order to protect junior creditors. *United States v. Key*, 397 U.S. 322, 25 L.Ed.2d 340, 346, 90 S.Ct. 1049 (1970). *See also Aetna Realty Investors, Inc., v. Monarch Beach Venture, Ltd. (In re Monarch Beach)*, 166 B.R. 428, 436 (C.D. Cal. 1993) (fair and equitable prohibits a plan from unfairly shifting risk of plan failure to the creditor).

In this case, the projections are not realistic and there appear to be inordinate management expenses that are imposed on all the Hotels. Moreover, Debtors seek to make interest-only payments for 18 months, yet it is clear that Debtors intend to take revenues from one Hotel and apply them towards the shortfalls in another. No information is provided as to the extent to which this is going to occur and what protections are going to be implemented to ensure that adequate reserves will be retained by Buffalo Properties and Hart Street.

In terms of projected revenues, Buffalo Properties and Hart Street generate the smallest amounts. Therefore, it is not reasonable to expect that either Buffalo Properties or Hart Street are in any position to make up the operating shortfalls on any of the other Hotels. Accordingly, Debtors must be precluded from diverting the revenues from Buffalo Properties and Hart Street for any other purpose.

PMC Trust also objects to any period of time during which interest-only payments are being made and Debtors must immediately start amortizing principal at a rate at least comparable to what is provided in the current loan agreements between PMC Trust and Buffalo Properties and Hart Street.

Debtors suggest that PMC Trust is adequately protected by an "equity cushion." However, a speculative equity cushion does not constitute the indubitable equivalent of PMC Trust's senior lien position. Debtors must assure that sufficient collateral will be available or other assurance of payment such that the secured claims of PMC Trust will be satisfied in the event of default. Having failed to do so, the Plan fails to comply with § 1129(b)(2) and provide the indubitable equivalent of PMC Trust's secured claim.

### 2. The Plan Fails to Provide to PMC Trust Adequate Interest on its Allowed Secured Claims.

The Plan provides that PMC Trust will be paid interest on its secured claim against Buffalo Properties at the fixed rate of 6% per annum for the remaining term of the Buffalo Loan, which is over 16 years. The Plan provides that PMC Trust will be paid interest on its secured claim against Hart Street at the fixed rate of 5.25% per annum for the remaining term of the Hart Street Loan, which also is over 16 years. No analysis whatsoever is provided as to how Debtor determined that this rate is appropriate. Under any applicable standard used for fixing the appropriate interest rate, the rate proposed in the Plan is inadequate.

The interest rates Debtors suggest do not adequately reflect the risk associated with the repayment terms and likelihood of default, as well as the risk that PMC Trust may not be made whole upon a default by Debtors. *See In re Fowler*, 903 F.2d 694 (9th

Cir. 1990) (approving the formula approach, which consists of a base "riskless" interest rate, and add a risk factor). *See also Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S. Ct. 1951 (2004) (approving in a Chapter 13 case the use of a prime rate plus a risk factor).

Initially, an appropriate interest rate consistent with what already is provided in the loan agreements between PMC Trust and Buffalo Properties and Hart Street reflects the absolute minimum to which PMC Trust is entitled and likely now is inadequate, given the changes that have occurred since the loans were made.

The interest rates proposed by Debtors are inadequate in two respects. First, the interest rates do not reflect the current risk associated with the likelihood of default and potential inability to recover in full from the collateral. The situation with the properties has changed significantly since the loans were made and there now is substantially more risk associated with them. First, the economy has deteriorated significantly, the local economy and environment in the Buffalo, Wyoming area has its own unique problems that may not change for many years to come. These problems are clearly evidenced by the substantial decline in the revenues generated by Buffalo Properties and Hart Street. Clearly, these are not the same loans that were made several years ago and the risk associated with them is now substantially greater.

The second type of risk that is not adequately provided for in Debtors' proposed interest rate is economic. Under the proposed Plan, the secured claims held by PMC Trust will not be paid for more than 16 years. During that time, general economic conditions can change and there can be periods during which increased inflation exists. Accordingly, either the interest rate must be allowed to adjust, as it does now to the LIBOR rate, or Debtors must be required to pay the secured claims of PMC Trust in full in a couple years and seek refinancing on the open market.

### 3. Preservation of all Rights Under the Loan Documents is Necessary to Protect PMC Trust's Interest.

The loan documents provide to PMC Trust certain essential rights that are necessary to protect PMC Trust's interest. The loan documents provide far more than the

terms for payment of the outstanding monetary obligation and set forth in detail the rights of the parties and establish other rights, duties and obligations. These provisions are material to PMC Trust and must be preserved in connection with the Plan and any other plan Debtors may propose. Accordingly, PMC Trust objects to any effort to cancel or otherwise modify the existing loan documents. Consistent therewith, all interests of PMC Trust in collateral held must be preserved to such extent under the Plan.

PMC Trust further objects to any limitation on the bases under the existing loan documents on which it can assert and pursue a default, or the circumstances under which such a default may be cured. The existing loan documents provide fair and adequate procedures for dealing with such issues. PMC Trust further objects to any provisions whereby Debtors are afforded a limited power of attorney to act for PMC Trust. Again, the existing loan documents and applicable non-bankruptcy law provide adequate remedies for the release of the security interests held by PMC Trust, if and when its claims are paid in full.

### 4. PMC Trust is Entitled to Allowance of All Portions of its Claims.

PMC Trust objects to the summary disallowance of default interest or any other charge provided in the agreement between the parties. These charges are expressly provided for and authorized under § 506(b).

### 5. PMC Trust Expressly Rejects the Proposal in the Plan to Accept a Single Cash Payment in the Amount of 75% of Its Allowed Secured Claims.

The Plan provides an election whereby PMC Trust shall have the right to elect to receive a single cash payment in the amount of 75% of its Allowed Secured Claim in full and complete satisfaction of its claims. PMC Trust specifically rejects this option.

### 6. Potential Avoidable Transfers of Funds From Buffalo Properties and Hart Street to Other Related Entities Must be Preserved.

Based on disclosures by Debtors, it appears that funds of Buffalo Properties and Hart Street have been used to pay the obligations of other related Debtors. Any potential claims, including preference or other avoidance claims, must be preserved under the Plan

with mechanisms for the pursuit thereof under appropriate circumstances.

### D. Preservation of Rights Against Third Parties.

Section 524(e) of the Bankruptcy Code provides:

> except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

PMC Trust objects to the Plan to the extent it attempts to affect the liability of any third party, including without limitation, the Blighs and any other party obligated to PMC Trust, whether under a guaranty or otherwise. *See Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir. 1985); *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995); *American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.)*, 885 F.2d 621, 626 (9th Cir.1989).

PMC Trust objects to any releases, injunctive relief or any other impairment of its claims that is broader than what is afforded under 11 U.S.C. § 524(e). Without limiting the foregoing, PMC Trust objects to any characterization that the treatment provided in the Plan is accepted in full satisfaction of its claim. Perhaps, if Debtors fully comply with the terms of the Plan, they have satisfied their obligations thereunder, but they have done nothing more and PMC Trust retains all its rights against other parties and other sources of recovery. PMC Trust also objects to the exoneration of claims of other parties and the governing of the reorganized debtor under a standard other than what would be otherwise applicable.

### E. The Plan Improperly Classifies Claims and the Consents as to Each Debtor Must be Separately Considered.

Section 1129(a)(10) of the Bankruptcy Code provides that a plan may be confirmed only if "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). The separate classification of parties to executory contracts is improper. Obligations as to executory contracts that are assumed are administrative expenses under 11 U.S.C. § 503(b)(1) that must be paid in full on

confirmation. Claims of parties to executory contracts that are rejected are general unsecured claims with no valid basis to classify such claims apart from other general unsecured claims. PMC Trust reserves the right to examine the balloting and other information to confirm that all claims are properly classified and that Debtors have satisfied the requirements of § 1129(a)(10).

Debtors are attempting to propose one consolidated plan for all these cases. While jointly administered, these cases have not been substantively consolidated. Therefore, whether a class has voted in favor of the Plan and whether the Plan may be confirmed must be determined as to each particular case.

### F. The Management Agreements Between Management and Each of the Hotels Must be Disclosed and Their Assumption May Not be in the Best Interest of the Estates.

The Plan discloses that there is a Management Agreement between Management and each of the Hotels. Section C of the Plan states that these Management Agreements will be assumed. [Plan, page 13, lines 10-12] Copies of these Management Agreements have not been provided with the Disclosure Statement and it appears that they have not been disclosed elsewhere in these cases.

It has not been established that the assumption of these Management Agreements is in the best interests of the estates operating Hotels. Debtors request to assume these Management Agreements must be denied and Debtors required to file a formal request to assume the Management Agreements, with full disclosure as to their terms and copies thereof, and a clear showing that their assumption is in the best interest of the estates.

### G. The Plan is not Filed in Good Faith, and Debtor has Failed to Comply With Applicable Rules Regarding Procedures for Confirming a Plan of Reorganization.

Section 1129(a)(3) requires that a chapter 11 plan be proposed in good faith and not by any means forbidden by law. *See* 11 U.S.C. § 1129(a)(3). A debtor's good faith should be determined on a case-by-case basis, taking into account the particular features of each plan. *In re Sylmar Plaza L.P.*, 314 F.3d 1070, 1075 (9th Cir. 2002).

Although the term "good faith" is not defined in the Code, courts have

interpreted good faith to mean a "reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *See In re Future Energy Corp.*, 83 B.R. 470, 486 (Bankr. S.D. Ohio 1988) (quoting *In re Nite Lite Inns*, 17 B.R. 367, 371 (Bankr. S.D. Cal. 1982)); *see also Hanson v. First Bank of South Dakota*, 828 F.2d 1310, 1315 (8th Cir. 1987).

It remains for Debtors to show that this Plan is more about an effort to provide a meaningful return to creditors rather than an attempt to preserve lucrative management arrangements for Debtors' principals.

### H. Reservation of Rights and Additional Objections.

PMC Trust reserves the right to review and approve the form of any orders proposed in connection with or part of the Plan for the purposes of ensuring, among other things, that all rights and interests afforded to PMC Trust are preserved. Without limiting any other rights, PMC Trust reserves the right to object to any and all claims, cure amounts due under executory contracts or leases, and applications for compensation or requests for allowance of other administrative expenses, and to adopt or incorporate, in whole or in part, the objections filed by any other party in these cases.

### III. CONCLUSION AND RELIEF REQUESTED

WHEREFORE, PMC Trust requests the Court to:

1. Deny approval of the Plan;
2. Grant Relief consistent with the foregoing Objection; and
3. Award other and further relief and the Court deems just and proper.

DATED: January 4, 2011

        SHERMAN & HOWARD L.L.C.

        By  /s/ Bryan A. Albue #009594
          Bryan A. Albue
          2800 North Central Avenue, Suite 1100
          Phoenix, Arizona 85004-1043
          Attorneys for PMC Commercial Trust

COPY of the foregoing e-mailed
January 4, 2011 to:

Christopher R. Kaup, Esq.
Tiffany & Bosco, P.A.
2525 E. Camelback Rd., Ste. 300
Phoenix, Arizona 85016-4237
e-mail: crk@tblaw.com
Attorneys for Debtors


    /s/ Bryan A. Albue  #009594